IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

WM. WRIGLEY JR. COMPANY,

      **Plaintiff and
Counter-Defendant,**

      **v.**

SWERVE IP, LLC,

      **Defendant and
Counter-Claimant.**

**Case No. 11 C 9274**

**Hon. Harry D. Leinenweber**

## MEMORANDUM OPINION AND ORDER

Before the Court is Swerve IP's Motion for a Preliminary Injunction, and Wrigley's Motion to Strike and Motion for a Hearing. For the reasons contained herein, Wrigley's Motions are granted in part and denied in part, and Swerve's Motion for a Preliminary Injunction is continued pending a hearing.

## I. BACKGROUND

Defendant and Counter-Claimant Swerve IP, LLC ("Swerve IP") moves for a preliminary injunction, barring Plaintiff and Counter-Defendant Wm. Wrigley Jr. Co. ("Wrigley") from allegedly infringing Swerve's federally registered trademark.

Swerve IP holds a word mark (SWERVE), the name of its "all-natural" erythirtol-based non-sugar sweetener. It has used the mark since 2001. The United States Patent and Trademark office (the "USPTO") registered it in September 2009. (Swerve IP acquired

the rights to the mark via assignment in 2011, evidently when the sweetener part of the business changed hands.) That registration covers "natural sweetener" in International Class 030 (which includes a large number of food and candy products).

Swerve sweetener is sold (in one-pound bags and in single-use packets) through online retailers such as *Amazon.com* and certain physical stores like Whole Foods. Similar sweeteners are evidently sold in convenience stores, and Swerve IP hopes to expand to those stores in the near future. The sweetener is also used in the commercial manufacture of some food products, including diet pralines, but Swerve IP hopes to expand into more mainstream markets, including chewing gum. The sweetener is promoted via social media sites such as Facebook and Twitter.

Wrigley manufactures and sells the popular "5" brand of chewing gum. There are a dozen different flavors, one of which is called "Swerve" — because, Wrigley claims, it changes from a "tangy" to a "sweet tropical" flavor when chewed. The gum is not "all-natural" but is sugar-free, and is marked as containing natural and artificial flavors. Wrigley markets 5 Gum as an extreme sensory experience, targeting customers in their teens and 20s. 5 Gum is sold mainly in grocery and convenience stores, though it is also available through *Amazon.com*.

In October 2010, Wrigley learned of Swerve IP's mark. That month, it applied to register "swerve" in International Class 030,

covering "chewing gum." Swerve IP opposed the registration. By all appearances, the opposition is still pending before the Trademark Trial and Appeal Board (the "TTAB").

In July 2011, Wrigley launched the Swerve flavor of 5 Gum. The flavor is featured on its website and social media outlets, and was advertised individually (but is no longer). In late 2011, Swerve IP sent Wrigley a cease-and-desist demand regarding the Swerve mark. Evidently after settlement discussions arising out of the TTAB proceeding failed, Wrigley filed a declaratory judgment action before this Court regarding its use of the Swerve term. Swerve IP has moved for a preliminary injunction.

## II. **LEGAL STANDARD**

"A party seeking a preliminary injunction is required to demonstrate a likelihood of success on the merits, that it has no adequate remedy at law, and that it will suffer irreparable harm if the relief is not granted." *Promatek Industries, Ltd. v. Equitrac Corp.*, 300 F.3d 808, 811 (7th Cir. 2002). If it meets that standard, the court then also must consider whether and to what extent the injunction would harm the enjoined party and/or the public. *Id.* These factors are evaluated on a sliding scale; the more likely a movant is to prevail on the merits, the less heavily the balance of harms needs to tip in its favor. *Id.*

### III.  DISCUSSION

As this briefing is largely under seal the Court discusses the evidence in only general terms.

### A.  Motion to Strike

Wrigley has moved to strike portions of Swerve IP's reply, contending that it includes new evidence and new arguments which could have been raised in the original motion.  Swerve IP contends that its evidence and argument are in proper response to issues raised in Wrigley's response, and was obtained in discovery after Swerve IP filed its motion.

Replies are not to be used to "patch holes" in the original briefing.  *E2Interactive, Inc. v. Blackhawk Network, Inc.*, No. 09-CV-629, 2010 WL 1981640, at *1 (W.D. Wis. 2010).  However, at this stage, unlike summary judgment, the record is not necessarily complete before the motion is filed.  *Cf. Black v. TIC Inv. Corp.*, 900 F.2d 112, 116 (7th Cir. 1990) (new evidence in a summary judgment reply should not be considered, unless the other side had a chance to respond).  Accordingly, district courts permit some "new" facts and arguments in replies, if they are directly responsive to issues raised in a response and do not prejudice the other side.  *See, e.g., Wynn v. Express, LLC*, No. 11 C 4588, 2012 WL 386716, at *3 (N.D. Ill. Feb. 6, 2012) (collective action preliminary certification).  The Court discusses each item of "new" evidence as necessary below.

- 4 -

### B.  Motion for Hearing

Wrigley claims that the Court must hold a hearing, so that it can confront the factual issues created by Swerve IP's reply brief. It claims that, because the Court opted to rule on the Motion to Strike simultaneously with the Injunction Motion, Wrigley needs a hearing "to be assured that the Court will not consider" the challenged material in ruling on the injunction.  Wrigley's Request for Hrg. 2.  Wrigley's fear that the Court will rule against it on the Motion to Strike is not a valid basis for holding a hearing. *See Promatek,* 300 F.3d at 814 (preliminary injunction hearing is required if the nonmoving party's evidence raises genuine issues of material fact.)  Furthermore, Wrigley's refusal to detail all of the fact issues that it believes exist, Request for Hrg. 2 n. 2*, is grossly insufficient.  As noted, the Court will not consider new evidence and argument that would unfairly prejudice Wrigley.  The Court will note when and if it finds questions of fact necessitating a hearing.

### C.  Preliminary Injunction

The parties agree that, at this stage, Swerve IP's state law claims stand or fall with the federal claims, and have not separately briefed them.  The Court follows suit.

As noted above, a party seeking a preliminary junction must demonstrate a likelihood of success on the merits.  *Promatek,* 300 F.3d at 811.  The parties appear to agree that irreparable injury

may be presumed from trademark infringement. The Seventh Circuit arguably cast doubt on that proposition in a recent copyright case. *Flava Works, Inc. v. Gunter*, --- F.3d ----, 2012 WL 3124826, at *1 (7th Cir. 2012) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392-93(2006)). *But cf. Am. Taxi Dispatch, Inc. v. Am. Metro Taxi & Limo Co.,* 582 F.Supp.2d 999, 1005 (N.D. Ill. 2008) (applying the presumption and citing*, inter alia*, *eBay.*). Given that the Court is ordering a limited hearing, below, the Court applies the agreed standard to this motion, but will entertain argument as to the impact of *eBay* at that time.

### 1. *Likelihood of Success on the Merits*

At this initial phase, the Court need only find that Swerve IP has a non-negligible likelihood of success on the merits. *Ty, Inc. v. Jones Grp.*, *Inc.*, 237 F.3d 891, 896-97 (7th Cir. 2001). To prevail on the merits, Swerve IP must show that: (1) it has a protectable trademark, and (2) there is a likelihood of confusion. *Id.* at 897. This is a "reverse confusion" case – one in which a junior user uses its size and market power to overwhelm a senior, but smaller, mark user. *See Custom Vehicles, Inc. v. Forest River, Inc.*, 476 F.3d 481, 484 (7th Cir. 2007).

Wrigley contends that the Court need not conduct the ordinary analysis, because the Swerve IP's feared harm is not actionable as trademark infringement. Wrigley points to the deposition of Ivan Echegarrua as establishing that the only harm Swerve IP fears is

unrelated to the concern that its sweetener will be mistakenly affiliated with Wrigley. Without going into confidential details, the Court finds the testimony is not inconsistent with the kind of confusion and loss of goodwill remediable under the Lanham Act. The testimony reflects a concern that Swerve gum's flooding the market would undermine the sweetener's independent reputation for being all-natural. Such a fear, the Court finds, implicitly reflects the assumption that the customer would connect the brands, consistent with a reverse confusion theory. *Cf. Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 957 (7th Cir. 1992) (noting that senior users are harmed when the "public comes to assume that the senior user's products are really the junior user's or that the former has become somehow connected to the latter.").

### a. Mark is entitled to Protection

"The law recognizes five categories of trademarks, in ascending order of distinctiveness: generic, descriptive, suggestive, arbitrary, and fanciful." *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 638 (7th Cir. 2001). Swerve IP notes that the mark's federal registration is *prima facie* evidence of its validity, *see* 15 U.S.C. § 1115(a). Wrigley does not argue that "swerve" is not protectable, but claims that it is weak because it is an English word and "not as arbitrary or fanciful as [the names of] sweeteners like SPLENDA or NUTRASWEET." Wrigley's Opp'n to Prelim. Inj. 23. The Court finds that from the consumer

perspective, the mark is arbitrary as to the sweetener, but suggestive as to the gum. It is therefore protectable.

### b. Likelihood of Confusion

"Seven factors comprise the likelihood of confusion analysis: (1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of the plaintiff's mark; (6) actual confusion; and (7) intent of the defendant to "palm off" his product as that of another." *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 643 (7th Cir. 2001). No factor is dispositive, and which factors are most important varies from case to case. *Id.*

"Reverse confusion" protects senior mark holders from the risk of losing "the value of the trademark — its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets" if the public comes to assume that its product is that of, or connected with, the junior user. *Sands, Taylor & Wood Co.*, 978 F.2d at 957-58. If it appears extremely likely that the mark holder will soon enter the junior holder's field, this factor weighs heavily in favor of injunctive relief. *Id.* at 958. Furthermore, the protection applies to products "closely related" to the senior user's product – that is, products which the public might think came from, or were affiliated with, the same source. *Id.* at 958.

- 8 -

i.  Similarity Between the Marks

Swerve IP argues that the word marks are identical.  Wrigley argues that, as presented in the marketplace, they are quite different:  Swerve IP uses "swerve," in orange script, as a brand name accompanied by the image of a multicolored bird.  5 Swerve Gum, it notes, uses a different font and sleek, black, futuristic packaging with a "pop" of color (mostly orange).  Furthermore, it notes that it makes "swerve" subordinate to the 5 and Wrigley marks, placing it where 5 Gum consumers know to look for the gum's flavor, not its sweetener.  Swerve IP rejoins that very few consumers will make a side-by-side comparison, and that where one word is particularly salient, it receives more weight.  *See Ty, Inc.,* 237 F.3d at 898-99.

The Court finds that Wrigley's consistent association of "swerve" with its other marks weighs in Swerve IP's favor.  *Sands, Taylor & Wood Co.*, 978 F.2d at 960.  Nonetheless, as presented to consumers, the marks are sufficiently different that this factor tips slightly in Wrigley's favor.  The Court does not hold that the marks are dissimilar as a matter of law.  *Cf. Chattanoga Mfg., Inc. v. Nike, Inc,* 140 F.Supp.2d 917, 925 (N.D. Ill. 2001) (declining to find marks dissimilar as a matter of where the words were nearly identical, and the other markings may not have fully mitigated the similarity.)

ii.  Product Similarity

The key issue here as to product similarity is whether the products are related enough that the public might attribute them (in source or affiliation) to a single producer. *Ty, Inc.,* 237 F.3d at 900.  The parties have focused extensively on their customers' demographics; although that information is not an intuitive fit with this factor, other courts have considered it, and the Court will do likewise. *See Pathfinder Commc'ns Corp. v. Midwest Commc'ns Co.,* 593 F.Supp. 281, 286 (D.C. Ind. 1984).

Swerve IP contends that the products are related, particularly because of the "close relationship between sugar-free food products and the non-sugar sweeteners (typically artificial) that such products use."  Mem. in Supp. of Prelim. Inj. 8.  Indeed, it argues, Wrigley previously co-branded one of its gum brands with the artificial sweetener NutraSweet.  It offers examples of other sugar-free gum and candy makers similarly co-branding (by, it claims, putting a sweetener's trademark in the same area of the package where Wrigley puts "swerve" on 5 Gum).  Furthermore, it argues, the Lanham Act protects a mark holder's ability to move into a related field, and it plans to move Swerve sweetener further into the mainstream gum and candy market.

Wrigley is correct that not all food products are related.  It argues that artificially flavored gum and all-natural sweeteners are not related and that there is no evidence that consumers

attribute them to a single source. (Actual confusion, however, is a separate factor.) Wrigley makes no sweeteners, and knows of no sweetener company that makes gum; it has not co-branded its gum with a sweetener since the 1980s, and even then, the sweetener mark was accompanied by "sweetened with —."

It also claims that Wrigley and Swerve IP's customer bases are very different: the sweetener targets diabetic- and health-friendly companies and women ages 38-60+, while 5 Gum is mass marketed, targeting users in their teens and twenties, not to a health-conscious population set. 5 Gum, it claims, is underrepresented in gum sales to adults 35 and over.

Wrigley further argues no mass-marketed all-naturally sweetened chewing gum exists, because all-natural sweeteners cannot cost-effectively provide the intensity and duration of sweetness that mass-market customers demand. In addition to its expense and short chewing life, erythritol "faces obstacles" to use in gum from "numerous patents and patent applications" (some of which, it seems, are Wrigley's). These obstacles, Wrigley claims, defeat Swerve IP's hope to enter the chewing gum market – and indeed, after 10 years, the sweetener's only candy application seems to be one "regional" diet praline company.

In reply, Swerve IP argues that Wrigley's relatedness argument is hypocritical, given that it previously opposed other 030 trademark registrations for fear of confusion with its own Citrus

Mint gum flavor.  The Court declines to consider this new evidence until Wrigley has a chance to respond in the hearing.

Swerve IP next argues that Wrigley is wrong to claim that there is no evidence of overlap between gum and sweetener makers, pointing to several trademarks (like NutraSweet) which are registered for both sweeteners and chewing gum.  The Court grants the Motion to Strike Exhibits 12-15, however, because they do not directly respond to Wrigley's argument; such cross-registrations, especially without evidence of their use, do not illuminate *consumer* perceptions.

Swerve IP next attacks the claim that there are no mass-marketed naturally sweetened chewing gums, arguing that Glee gum is all-naturally sweetened and available in the same stores as Swerve gum, and that Trident is sweetened with xylitol.  (This evidence appears to be disputed – as to where Glee is sold and whether Trident's xyltiol is synthetic – and is presented for the first time in reply; the Court therefore sets it aside until the hearing.)  Swerve also argues that Wrigley ignores a number of gums which advertise their all-natural sweeteners; their market, however, is unclear.  As to whether gums ever co-brand with sweeteners, Swerve IP notes that it is currently negotiating with a Wrigley competitor for possible Swerve sweetener use in, and co-branding with, a gum product.  Those talks, however, have not yet progressed to discussing terms.

Swerve also argues that the products' customer groups overlap. It notes that even if 5 Gum is under-represented in the adult market, sales to that group are still substantial; therefore, even if Swerve sweetener is generally marketed at retail to women aged 38-60+, the customer bases overlap. The Court finds that Wrigley is unlikely to be prejudiced by Swerve IP's Reply Exhibit 18, which responds to Wrigley's argument and which Wrigley produced in discovery; nonetheless, the Court takes Swerve IP's point, even without that exhibit. This, however, does not throw open the door to all demographic evidence; Swerve IP's new evidence regarding the target demographics of magazines in which Wrigley has advertised (Exs. 18-24) is appropriately disregarded at this stage.

Finally, Swerve IP argues, any "incidental distinction between the target demographics here fails" when one considers that Swerve gum is displayed at the checkout lines of mass-market stores, and is therefore exposed to all demographics.

Even having declined to consider nearly all of Swerve IP's evidence in reply, the Court finds that this factor favors Swerve IP. It appears that other manufacturers, and even Wrigley in the 1980s, have co-branded gum and candy products with sweeteners. Accordingly, the public may well believe that Swerve sweetener has somehow become affiliated with sugar-free Swerve gum. Furthermore, Wrigley's own evidence tacitly acknowledges that the customer groups may overlap. Therefore, while the Court reserves judgment

on the final strength and weight of this factor until the hearing, it currently favors Swerve.

        iii.  Area and Manner of Concurrent Use

Several factors are relevant to whether to products are related in terms of use, promotion, sales or distribution such that their area and manner of concurrent use supports a finding of confusion, including: their geographical distribution areas, any competition between them, whether they are sold in the same section and type of store, and whether they are sold through the same marketing channels. *See Ty, Inc.*, 237 F.3d at 900.

Swerve IP contends that both products are sold nationwide, and through online retailers such as *Amazon.com*. Furthermore, it argues, Swerve gum is sold in the same physical stores, like convenience stores, as other sugar substitutes. Both are marketed through same social media channels (Facebook and Twitter). Accordingly, it contends, the products will likely be encountered by the same consumers.

Wrigley claims that being sold through the same online mega-retailer hardly makes the products similar. Wrigley emphasizes that it sells chewing gum and candy, not their ingredients, and does not sell goods in health or specialty stores (which comprise most of Swerve IP's retail presence). It emphasizes that Swerve Sweetener is carried in only a few "regional" grocery stores, and that even if it gains wider distribution, it would likely still be

in the baking or health food aisles. Finally, Wrigley argues any overlap is limited by Swerve IP's "extreme regionality."

In reply, Swerve IP stresses that the products are sold in the same "specialty section" of *Amazon.com*. Furthermore, it contends, Wrigley admits that both products are sold in "grocery stores"; the fact that the sweetener is not yet sold in the biggest chain stores "is but a consequence of its size." Reply 14 n.9. It stresses that Swerve gum and some "natural sweeteners" may be sold in the same general area of physical stores, and that even if they are sold in different aisles, Swerve gum gains wide exposure by being sold in checkout aisles. Finally, it contends that even if Swerve gum is no longer advertised, it has already reached a high market saturation.

The Court agrees that being sold through *Amazon.com*, or marketed through social media, is hardly unique, and that a very small portion of Wrigley's sales are online. Though neither party discusses it as such, however, the Court notes that online stores operate in part through keyword searches, which seems to increase the likelihood that customers will encounter the products and promotional materials together. Furthermore, Wrigley appears to concede that a few "regional" grocery stores may sell both products, though where in the store is unclear. This factor is too close to weigh heavily in favor of either party, but slightly favors Swerve IP.

iv.  Degree of Care Exercised by Consumers

The level of care exercised by consumers is a significant factor in assessing the likelihood of confusion. *Rust Env't & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1217 (7th Cir. 1997).  Although in forward confusion cases both parties' customers are relevant, *see CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 682-83 (7th Cir. 2001), the Court finds persuasive those cases which find the senior user's customers more important in reverse confusion cases. *Matrix Motor Co., Inc. v. Toyota Jidosha Kabushiki Kaisha*, 290 F.Supp.2d 1083, 1095 (C.D. Cal. 2003).  The less expensive the product, the less care consumers are expected to use. *CAE, Inc.,* 267 F.3d at 682-83.

Although Swerve may be more expensive than some other sugar substitutes, the Court agrees that both products are cheap enough not to trigger a great deal of consumer scrutiny.  Wrigley further objects, however, that Swerve IP conceded that its customers – like most consumers of health food and diet-related products – shop somewhat carefully.

In reply, Swerve IP contends that "[i]t is *precisely* because [Swerve IP's] customers care about the type of sweeteners that are in the products they buy that the loss of control over the mark is so important.  Consumers who care about natural ingredients are more likely to draw upon their recollections about the ingredients than consumers who are unconcerned with an artificial sweetener."

Reply 15. It is unclear, however, how that leads to confusion – whether, for example, consumers will see the Swerve mark on the front of the gum package *and* notice the lack of natural sweeteners, or will be drawn initially to swerve gum by the association with a natural sweetener. *Cf. Promatek,* 300 F.3d at 812-13 (explaining initial interest confusion). (Absent any other discussion of initial interest confusion, the Court presumes former.) In any event, given the lack of dispute that Swerve IP's customers - the more relevant group here – use some degree of care, this factor tips slightly in favor of Wrigley.

Swerve IP further argues that it is currently negotiating with a Wrigley competitor, and once swerve sweetener is introduced as an ingredient in mass market gums and candies, any distinction between the parties' customers will disappear. This motion seeks a preliminary, rather than permanent, injunction, however. Absent any indication that such production is likely during the pendency of this case, the Court concludes that it need not factor in that scenario at this time.

v. Strength of Complainant's mark

The "strength" of a trademark refers to the mark's distinctiveness and ability or tendency to identify the goods sold under that mark as originating from a particular source. *Sands, Taylor & Wood Co.,* 978 F.2d at 959. In reverse confusion cases, the focus is on the junior use of the mark. *Id.* If the marks are

- 17 -

identical and the products closely related, this factor matters little, but this Court has already found that the marks are presented differently to the public. The Court has also found, as noted, that the mark is arbitrary as to the sweetener, and suggestive as to the gum.

Swerve IP argues that the mark is commercially strong because Wrigley, a leading gum manufacturer, has promoted 5 Gum nationwide. Wrigley objects that the Swerve gum mark has not reached a market saturation sufficient to create reverse confusion. It offers no authority for what that point is, but stresses that it does not now, and does not plan to, advertise the Swerve flavor specifically. Wrigley is skeptical that the Swerve flavor has unique goodwill, and that gum *flavors* (as opposed to brands) become famous. It emphasizes that the flavor name is always subordinate to the Wrigley and 5 Gum marks in packaging and past advertising (as noted above, however, this does little to help its case).

Swerve IP rejoins that, Wrigley's own evidence makes 5 Gum the third most popular in the country (though, the Court notes, that includes all 5 Gum flavors). The Court declines to consider Swerve IP's newly-offered Exhibits 19 and 26, but finds adequate support for 5 Gum's large market presence, and the swerve flavor's notoriety within that brand (*see, e.g.*, the February 2012 Swerve advertisement in Rolling Stone) in the previous evidence. Although

Swerve gum may not dominate the chewing gum market, this factor weighs marginally in Swerve IP's favor.

### vi.  Actual Confusion

There appears to be no dispute that there is no evidence of actual confusion.  Although actual confusion is not necessary, *see Id.* at 960, this factor weighs in favor of Wrigley.

### vii.  Intent

Intent is irrelevant in a reverse confusion case.  *Id.* (Whether Wrigley knowingly ignored Swerve IP's trademark is relevant – just in balancing the harms.  *Ideal Indus. Inc. v. Gardner Bender, Inc.,* 612 F.2d 1018, 1026 (7th Cir. 1979)).

Although many of these factors present close questions and not all of them favor Swerve IP, the Court concludes that Swerve IP has shown a better than negligible chance of prevailing.

### *2.  No Adequate Remedy at Law/Irreparable Harm*

Swerve IP also must prove that it has no adequate remedy at law, and will suffer irreparable harm absent an injunction. *Promatek,* 300 F.3d at 813.  The parties agree that there is a presumption of irreparable damages in trademark infringement cases. The debate is whether Wrigley overcame that presumption.

Wrigley argues that, by its ever-increasing settlement demands, Swerve IP admits that any harm to it is compensable. Wrigley claims to offer the settlement evidence to prove Swerve IP's financial motive for this injunction, not to prove that

confusion is unlikely. The Court nonetheless finds the evidence barred by FED. R. EVID. 408, which excludes evidence of settlement negotiations offered "to prove or disprove the validity or amount of a disputed claim" or to impeach a witness. Although this situation is an awkward fit with the Rule's language, the Rule is to be interpreted to further its purpose of encouraging settlement. *Bankcard Am., Inc. v. Universal Bancard Sys., Inc.*, 203 F.3d 477, 484 (7th Cir. 2000).

Wrigley essentially asks the Court to use the settlement evidence to reject the type, rather than the "amount," of claimed damages. Nonetheless, the Court finds that it would better serve the purpose of the Rule to exclude this evidence than to allow any settlement talks involving financial consideration to undermine a claim for injunctive relief. That the talks originated around the TTAB proceeding does not change the result. The TTAB proceeding is closely tied to this one, and the Court is aware of no strong policy favoring admission under these circumstances. *Cf. Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 690 (7th Cir. 2005) (finding that the policy behind Rule 408 was not thwarted "in the instant case" by admitting a letter from a "not totally unrelated" case).

Apart from the settlement evidence, Wrigley argues the Swerve IP peddles the sweetener to food manufacturers, on a branded or unbranded basis, regardless of whether the end product would be (or

is) all natural. It has thus, Wrigley claims, put its reputation and goodwill up for sale. The Court agrees with Swerve IP, however, that there is a critical distinction between licensing an all-natural sweetener for use in a product that is not all-natural, and associating the brand with a product which uses *only* artificial sweeteners.

Wrigley's cited cases do not support it. The discussion to which it cites in *20th Century Fox Film Corp. v. Marvel Enter., Inc.*, 155 F.Supp.2d 1, 43-44 (S.D.N.Y. 2001) addressed an injunction on a breach of contract claim. In *Johnson Pub. Co., Inc. v. Willitts Designs Intern., Inc.*, No. 98 C 2653, 1998 WL 341618, at *8 (N.D. Ill. June 22, 1998), the court noted that the presumption was sufficient to establish irreparable injury, *despite* finding the case weakened by the moving party's delay in seeking relief. Although Wrigley suggests some delay, *see* Opp'n at 7, it makes no concerted argument to that end, or about being lulled into a false sense of security. *See Ty, Inc.*, 237 F.3d at 902-03. Accordingly, assuming that the presumption of irreparable harm applies, Wrigley has failed to overcome it.

### 3. *Harm to Wrigley*

Wrigley contends that it would be irreparably harmed both financially and intangibly by an injunction. It contends that its immediate financial loss would exceed $2 million, including packaged inventory, "raw materials, lost sales, and rebranding

costs." Wrigley Opp'n 14. Furthermore, it contends, its relationships with distributors and retailers, including its share of shelf space, would irreparably suffer.

Wrigley's supporting evidence, however, is very general, and plays coy regarding important issues such as the breakdown of these financial harms, the projected life of the Swerve flavor, and what if any alternate products are in development. Furthermore, there appears to conflicting evidence regarding whether the Swerve flavor could be replaced in stores by another Wrigley product. Accordingly, the Court finds that the question of Wrigley's likely harm, and therefore the balancing of the harms to the respective parties (and the public), and setting the amount of any necessary bond, requires a hearing.

## IV. CONCLUSION

For the reasons stated herein, Wrigley's Motions to Strike and for a Hearing are granted in part and denied in part. Swerve IP's Motion for a Preliminary Injunction is continued, pending a hearing on the issues identified herein.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

**DATE:** 9/28/2012

- 22 -